I note that you were appointed under the Criminal Justice Act and the court appreciates your service. Thank you, Your Honor. Good morning, Your Honors. My name is Robert Pauly. I, along with Ms. Natalie Pauly, same spelling, represent Tou Thao. We bring this appeal and ask the court to overturn the conviction on two grounds. First is sufficiency of the evidence and then the second would be for prosecutorial misconduct, which denied my client his right to a fair trial. And I think the main issue that I would like the court to focus on is the issue of proof as to willfulness. Because both of the counts that my client was convicted on require the government to prove beyond all reasonable doubt that my client's actions were done willfulness, which is a specific intent which requires the actions to be done for a very specific bad or illegal purpose. Counsel, maybe you can explain the Scrooge case to me because I read that case as saying that willfulness includes reckless disregard. Do you agree with that? That's my reading of the case. And if so, doesn't that weaken your argument here? Your Honor, I do agree with that case because the court was very clear that willfulness can include recklessness or a reckless disregard. But as to the facts of this case, I don't think that changes the focus at all. Because the issue still is what was the intention behind my client's action. Whether it's done intentionally or whether it's done in reckless disregard, it still requires that specific bad purpose. So I don't think the Scrooge case to that extent weakens the argument. It's just a different type of conduct that can be considered to be willfulness. Is recklessness a question of fact to which we would apply a clearly erroneous standard? I believe it is. Although I think the court in its review of sufficiency has to look at all of the evidence, including the evidence that was presented by the defense with regard to the idea of excited delirium and my client's actions taken with regard to his decision to believe that Mr. Floyd was experiencing excited delirium and then look at the actions that he had undertaken in response to that, specifically with regard to how he was trained by MPD and their training mechanisms. Okay. And I think I'd like to focus on the issue of the evidence itself, because regardless of whether we're doing the argument or looking at the analysis of the sufficiency of the evidence or whether it's prosecutorial misconduct, one of the things the court must take into consideration is the strength of the case against my client. Because obviously the first analysis under prosecutorial misconduct is were the prosecutor's actions improper? And then the next prong of the analysis is the strength of the case, because the stronger the government's case, obviously, the less influence we would assume whatever misconduct occurred would have on the sufficiency of the verdict. And then the third prong is obviously the court's curative actions. And I'd like to begin by focusing sort of on this case in totem or in total, because the conduct that we objected to and the conduct we bring to the court's attention was pervasive. In other words, it started at the outset during the government's opening statement and went all the way to the very end of their closing argument. It was misconduct that came in a number of different forms and a number of different times and was essentially going throughout this case and taking against the jury's focus off the evidence. One of the things I'd like to focus on specifically is the idea of vouching or reverse vouching that was done in this case. Specifically during the closing argument, the prosecution used the word lying several different times in describing the defendants, but one of them obviously being my client and his conduct. And I think that one of the issues the court looks at in these analysis is, was it improper conduct? Because prosecutors are allowed to defend and object. We did object, Your Honor. During the argument. During the closing argument, we did object as to vouching. And that's important because some of the cases that are cited in the briefs are cases where there wasn't objection or wasn't clear objection to that. And one of the cases that at least I reviewed talks about an excellent test for determining whether the prosecutor's statement was a personal endorsement is whether counsel contemporaneously thinks the line has been crossed and objects, which in turn allows the court to instruct the jury. I'm looking at just a list of kind of the allegations you make regarding the prosecution's conduct. It looks like most of these, at least, the district court sustained objections to. Would you agree with that? I would agree to that. And then the district court denied your motion for judgment of acquittal, basically saying, look, it's a weak case, but it's sufficient here. How do you respond to what the district court did there? Because, again, there's objections sustained, objection sustained. You know, that seems to have an effect on the jury, too, where the district court keeps reprimanding the prosecutor for conduct. I would agree. But I'd like to point out two things. One, in the court's ruling denying our motion for a directive verdict, he talked about the strength or weakness of the government's case, and he talked about the zealousness of the prosecution. I think sort of in general, but then also specifically dealing with some of the issues that we brought. And I think the court noted that there was sufficient evidence that could allow a jury to find for the defendant, but wasn't willing to substitute the court's judgment for that of the jury. And I understand completely the court's process on that. I think that is, in a lot of senses, proper. And I think, obviously, one of the issues is the district court is typically in the best position to judge the conduct of the trial itself and the evidence. But I think it's telling that the court also questioned the strength of the case and talked about how, in a case like this, the potential exists for a jury to be overwhelmed and to be deciding the case on issues that weren't really properly before a jury. And I think that's sort of the flavor of the trial itself. I mean, in looking back at it, we had four prosecutors of record essentially weighing in on the case, three of them primarily. Each one of those particular prosecutors was very seasoned, was very prepared, and I have nothing but the utmost respect for them. That being said, their particular conduct in this case started at the very outset of the trial through the opening statement, being argumentative, arguing at the court, all kinds of different things that at least I view as improper. And it was each of those prosecutors that engaged in their own form of misconduct. And when you look at the cases that deal with prosecutorial misconduct, one of the things they look at is was it pervasive, was it more on multiple instances, which could have a greater effect on the jury's ability to sort through the evidence in a proper fashion. So I understand the court's ruling. I respect the court greatly, and I understand that that district court was in the best position to make those type of determinations. But I don't think that prohibits this court from looking at the case in an objective fashion, sort of after the fact, and weighing in sort of the weight and the prejudice of the particular misconduct. You know, it looks like an awful lot of the alleged misconduct arises out of the closing argument, right? And so what you've got is a trial that's hard fought, and there's some pushing on the edges, and then you get to the closing argument, and there's a level of zealotry that it's quite apparent the judge did not appreciate because there's objection sustained after objection sustained. And, you know, having sat in that position more than once in a high-profile case some point in my career, that's always a very difficult place for the judge. At any point, did anybody request any type of a sidebar? Because I have not read the entire transcript. During that closing argument, you know, did they give the judge an opportunity to really try and rein these people in? I don't recall, and part of the unusualness of this particular trial was that it was done during the pandemic. And so what we were doing for purposes of avoiding issues was we would put on headphones and have sidebars while we were sitting at the table. I don't know that any of those were done during the closing argument, and I apologize for my inability to recall specifically with regard to that. But I think there were a number of objections that were made to the government's closing, and I'd also like to point out that one of the last objections made was at the very end of the prosecution's rebuttal closing argument when they talked about evil happens when good men do nothing. And that had been objected to previously and sustained, and yet it was done at the very end of the rebuttal. And, of course, under the rules of criminal procedure, we don't have an opportunity to respond to that. Did you ask for a surrebuttal? I don't believe I did, Your Honor. Yeah, I know it's rare, but I mean, I've granted surrebuttal two or three times in my career just for that reason. Yes, and I would agree that this was a lengthy, hard-fought trial. And, again, when I use the term prosecutorial misconduct, I'm referring to the conduct of the prosecutor, not the prosecutors themselves, because, again, these were very good and very respected prosecutors. But I think sometimes the zeal of advocacy can overcome sort of what the prosecutor's duty can be, and their ability to withstand that is understandably human. And I wouldn't know it unless anyone has any additional questions. I have reserved five minutes, so thank you. Good morning, Your Honors, and may it please the Court, Elizabeth Hacker for the United States. This Court should affirm the judgment below in its entirety. The District Court correctly held that the evidence at trial was sufficient to sustain the jury's verdict and that Mr. Tao's claims regarding prosecutorial misconduct were meritless. With respect to the sufficiency argument, I'd like to first discuss Did the Court really find that they were meritless or just insufficient to justify a new trial? I mean, if you look at it, there were repeated objections that were sustained, and there was, in fact, the exact same language used a second time after the objection had previously been sustained. And whatever else that is, I can tell you that that's almost an invitation to find some judge on your case in a big way. You know, and so I don't, I don't, I'm not quite sure I would characterize it as completely meritless. Certainly, Your Honor, the judge did believe that some of the prosecutor's conduct at trial was improper. However, what I mean when I refer to meritless, Your Honor, is the claim that the alleged misconduct permeated the trial in some way. And as Mr. Pauly admits, the District Court is actually in the best position to know whether any alleged misconduct permeated the trial. And, Your Honor, if you read the transcript in its entirety, you'll see that the District Court judge not only admonished the prosecutors and sustained the defense objections, but it went the other way as well. There were many, many occasions where the prosecutors objected to something that the defense did and an objection was sustained. And certainly, Your Honor, the government does not — What difference does that make to the issue before us? That strikes me as totally irrelevant. Certainly, Your Honor. I'm only making the point that this was not an occasion where — these were garden-variety evidentiary disputes. This was not an overbearing prosecutor with the defense — I thought Judge Erickson was focusing on the closing, the repeated improper closing argument. I'm not sure he was focusing on the closing argument. If he was focusing on the closing, there were problems that the District Court found with the closing. However, again, the District Court judge is in the best position to know whether any such alleged misconduct permeated the trial to a degree that it caused prejudice. And in this case, the District Court judge correctly found that it did not. You know, as I read the parts of the transcript that I read, it really looked to me like what you've got going on is hard-fought trial, push to the limits by both sides, judge having, you know, I thought kind of a firm but gentle hand, a type of experienced District Court work that we find quite admirable. And then at the closing argument, it took on a totally different tone. And, you know, maybe just that I've sat for so many years as a trial judge, I find that very frustrating because you do everything you can to keep the train on the tracks and then you get to closing argument and you find that there's 15 objections that are sustained and there haven't been 15 sustained objections in the whole rest of the trial and you're just thinking like, what are you people doing? And, you know, the question I've got is really when does that become severe enough that it actually permeates the trial because it has a negative impact on the jury? Certainly, Your Honor. And I would point out as well, Your Honor, that there were many curative statements here. The District Court judge said at the opening of trial, at the closing of trial, that the prosecutor's statements are not evidence. Repeatedly told the jury that the only evidence in this case are the transcripts, excuse me, the exhibits, the testimony, and that statements by the prosecutor are not evidence. So there was a lot of curative instruction here. And this Court has found that that really does make a difference here. And, again, Your Honor, the District Court judge certainly thought that there was improper conduct during closing, but is in the best position, and this Court reviews for abuse of discretion here. Certainly, the District Court judge did not act as a rubber stamp here for the government. But still found, despite that, that this was not something that permeated the trial to a degree that required a mistrial. And in addition to the curative instructions here, I would like to also point out, Your Honor, that something that this Court considers is the strength of the overall evidence. And here, Your Honor, we believe that the strength of the overall evidence was very, very strong. So — That's what the District Court said? So now you're arguing the District Court was wrong about the case? Certainly, Your Honor. We believe that this evidence here was very strong, and I'm happy to go through that. We do believe that the — Well, I just point out that after fighting to defend the District Judge, you then make a broad argumentative assertion contrary to what the District Judge said on the record. Your Honor, we do respectfully disagree with the District Judge that the case in this evidence was not strong. We believe that the evidence here was overwhelming. Do you agree that this is only the second time that disregard of serious medical needs has resulted in a conviction? A criminal conviction, Your Honor, but I'd like to point out that this Court has squarely held that it violates the Constitution to disregard the serious medical needs of an inmate. And in 1983 cases, this Court repeatedly has held the officers liable for disregarding an individual's serious medical needs. So it has held that this is a constitutional right, and when that is done willfully under color of law, that meets all the evidence of a 242 claim, Your Honor. Your Honor, if I could move — Your Honors, if I could move on to the sufficiency arguments here. I would like to first talk about how the evidence, which included testimony from six eyewitnesses, 15 video recordings, and Mr. Tao's own testimony, was more than sufficient to support the jury's holding. This testimony and video evidence showed that Mr. Tao was right next to Mr. Chauvin and Mr. Floyd for the first six minutes that Mr. Floyd was restrained, and he watched Chauvin kneeling on Mr. Floyd's neck. He saw during this time that Mr. Floyd was on his stomach, with his hands cuffed behind his back, and was not resisting. At 8.25 p.m., right after Mr. Floyd lost consciousness, Mr. Tao moved just steps away, but continued to look back at the other officers for the remaining time that Mr. Floyd was on the ground. The evidence showed that Mr. Tao knew that the force Mr. Chauvin was using on Mr. Floyd was unreasonable under the circumstances. Multiple MPD officers testified that MPD officials are trained that once a suspect is handcuffed and no longer resisting, officers should stop using any force. And Mr. Tao admitted on the stand that he knew that force should be used only on suspects who are actively resisting. Those same MPD individuals testified that MPD trains its officers that neck restraints should be used only to gain control of arrestees, to get them and handcuff them. But after an arrestee is handcuffed and under control, the neck restraints should immediately stop. And the testimony showed that MPD does not train officers to use their knees to apply pressure to an arrestee's neck, and certainly not for nine minutes, continuing even after the arrestee loses consciousness. Mr. Tao admitted that the neck restraint Mr. Chauvin used on Mr. Floyd was not the kind of neck restraint the MPD trains its officers on. And importantly, Your Honor, in response to what Mr. Pauly said, this training applies. Mr. Tao admitted this same training applies regardless of whether the officer believes that the training is exactly the same. With regard to moving the individual to the side position. And finally, the evidence showed that Mr. Tao knew that he had a duty to intervene in another officer's use of unreasonable force. Again, Mr. Tao admitted this on the stand. Moving on to delivery indifference to serious medical needs. The evidence was sufficient to support the jury's conviction here. The jury saw video showing that from 8.19 p.m. to 8.25, while Mr. Chauvin knelt on his neck, Mr. Floyd told the officers no fewer than 25 times that he could not breathe. Video shows him begging for help and telling the officers that he was about to die. During this time, Mr. Tao was standing directly next to Mr. Chauvin and Mr. Floyd and repeatedly looked down at them. He admits that he heard Mr. Floyd saying over and over that he couldn't breathe. And Mr. Tao knew when Mr. Floyd lost consciousness, he saw it for himself. And he heard multiple bystanders tell him that Mr. Floyd was unconscious. Mr. Tao's inaction here directly contradicted his police training. Testimony showed that Mr. Tao knew that he should have moved George Floyd to a side recovery position to facilitate breathing, particularly true since Mr. Floyd had said repeatedly that he could not breathe. And testimony showed that Mr. Tao was trained that when an arrestee loses consciousness, should check their airways, their breathing, their circulation, and if necessary, SART-TPR. And the testimony showed that Mr. Tao knew that he had the duty to render medical aid, even if he knew that EMS was on its way. Again, he admitted this on the stand. Your Honor, with respect to prosecutorial misconduct, and I know Your Honor has had some questions about that, I'd like to just make a couple points in response to the defense. With respect to insinuating that Mr. Tao was lying, I would like to just correct the record, and I don't believe that the defense actually objected to that during the closing here. But the courts have also held that these kind of questions are okay when accompanied by references to the evidence. Not just, you know, we think he's lying in some pejorative way, but pointing to discrepancies in the evidence. And our brief cites the Francis case from the Sixth Circuit and the Schaaf case from the Eighth Circuit in 1998. What case from the Eighth Circuit? The Schaaf case in 1998. Isn't it a little different when you start a sentence speaking of lying? I mean, you know, that seems to be a characterization of a nature which we have ordinarily frowned upon as opposed to, you know, Mr. Smith said X and Y equals F. Then that, my friends, is a lie. Which is more of a statement of saying that's untrue, I've looked right at the evidence, there it is, rather than just saying, hey, speaking of lying, what about this? You know, that does seem to be a bit over the top. Certainly, Your Honor. And your point certainly is taken here. But I will just point out again, this was at the end of a 21-day trial, over 4,000 pages of transcripts, 33 witnesses, and there were curative instructions here. And the district court made clear in front of the jury that he did not think that this was right, despite the fact that there was no specific objection here. So while I certainly understand Your Honor's point, the district court correctly held that this type of conduct did not permeate the trial to a degree to render it prejudicial to Mr. Tao's substantial rights. If the court has any further questions, I'd be happy to answer them. If not, the government asks that this court affirm the district court. Thank you. Thank you. Your Honor, with regard to rebuttal, I'd like to read from the transcript of the part that the court inquired. Going to page 4,027, when Ms. Sertich was in her closing argument, she said, You should not believe any of this testimony, and you can use these lies when you decide to believe or disbelieve King and Lane and Tao's other testimony. The reason a person lies is because the person knows that he has. Mr. Robert Pauly, I'd object to this as improper vouching. The court final argument. Continue. Government's closing went on. The reason a person lies is the person knows he has something to hide. It's evidence of willfulness. So this was objected to, which subjects it, obviously, to a different review standard. But the court overruled the objection and let the government continue. And so this is something that wasn't dealt with with a curative instruction. And the phrasing, the way the question was phrased isn't, I submit to you that, or when they talk about a person lying, they then go back to refer to the particular reasons why a person is lying. This brings essentially the personal belief of the government into the fray. One of the reasons that we deal with prosecutorial misconduct is that prosecutors have a dual role, obviously, a zealous advocate, but also one who's there to strike a hard blow, but a fair blow, because they have the weight of the government. And to imply that the government either knows the truth and that a defendant is not being honest brings the weight of the government and the government's credibility into the fray, which is why it is not proper. So I would like the court to focus on that. Some of the issues with regard to the evidence that was brought about indicates that the training of Officer Tao was that once a person was under control that no more force should be used. If the court looks to Inspector Blackwell's testimony, she was the police officer who was in charge of the Minneapolis Police Training. She testified specifically that Minneapolis Police Department trained its officers that when dealing with a person experiencing excited delirium, law enforcement control measures should be combined with immediate sedative and other medical intervention to attempt to reduce the risk of death. This was the transcript at page 1265. The idea is that at the time this was going on, what they were training the officers is if they believed a person was experiencing excited delirium, they should continue restraining them until medical intervention arrived and they would sedate them typically with ketamine. This was one of the issues that Hennepin Health Care was dealing with at the time, that they discontinued after this. But that goes directly to willfulness in terms of the training. Also with regard to the idea that the Minneapolis Police Department did not train its officers to use a knee on somebody's restraint, if you look at the PowerPoint trainings from the academy and even exhibit T12, which is the PowerPoint that Minneapolis Police used to train both in the academy and its in-service training, you'll see the picture that indicates the use of force instructors are sitting there watching as someone's got their knee on the back of a person's neck to restrain them when they're in the prone position being handcuffed. The final thing I would like to point out with regard to the evidence is one of the issues that came up during the trial is that the police officers are trained that when a person doesn't have a pulse, they're supposed to institute immediately CPR, cardiopulmonary resuscitation. When my client's standing there dealing with the crowd to some level and looking back, what does he not see? He does not see Mr. Foy being rolled over and CPR being administered. And this goes to his intent, which goes to willfulness, because he's essentially relying on the other law enforcement officers to be monitoring the medical condition of Mr. Floyd, and it's logical for him to assume when Mr. Floyd is not being rolled over and CPR, given that he has a pulse, despite what's going on in front of him and what the people are telling him. That's the evidence that goes specifically to the willfulness. Unless anyone has any more questions, I would just simply ask the Court to remand this case for a new trial. Thank you very much.